HENRY M. ANTHONY *et al.* *vs.* JONATHAN BOYD *et al.*

To sustain a compromise there must be a claim doubtful, but made in good faith, and no deceit in the settlement agreed on.   It is not compromise when one party, knowing that he has not a valid claim, deceitfully misleads the other party into believing that he has one.

Mere suspicion without knowledge of facts will not estop a party from setting up fraud in a compromise.

BILL IN EQUITY to set aside conveyances of realty as fraudulent, and for an injunction.

The facts found by the court are stated in its opinion.   The bill was demurred to, and, after argument, the demurrer was overruled.   The case then came before the court for hearing on bill, answer, and proofs.

Charles Hart & William G. Roelker, for complainants.

James M. Ripley, John F. Lonsdale, and George J. West, for respondents.

Even if the transfer was fraudulent, as intended to defeat the claims of the creditors of William Boyd, still the complainants cannot succeed.

I. This is an attempt to invoke the interference of a court of equity to annul an executed compromise.   Courts of equity seek to sustain compromises entered into to avoid or terminate litigation.   Bispham's Principles of Equity, § 189; 2 Leading Cases in Equity, 1703; *Stapilton* v. *Stapilton*, 1 Atk. 2; *French* v. *Shoemaker*, 14 Wall. 314; *Whipple* v. *Whitman*, 13 R. I. 512; *Bell* v. *Lawrence's Adm'r*, 51 Ala. 160, 162.

II. Nor is this case one of such misrepresentation or concealment as to be within the exception to the general doctrine just stated.

a. The fraudulent representation complained of, *i. e.* that the Chicago property belonged to Jonathan, was the very representation, the falsity of which was known to their testator, and which was the foundation of his action which he compromised. It was the *very fraud* which he compromised. Hence the complainants cannot avoid the transfer made by him, and newly discovered evidence of said fraud is not sufficient to entitle him or his executors to the assistance of this court. 2 Leading Cases in Equity, 1704–1706; *Allis* v. *Billings*, 2 Cush. 19, 24–27; *Mills* v. *Lee*, 6 T. B. Mon. 91, 97, 98; *Worrall's Accounts*, 5 W. & S. 111, 115; *Fisher* v. *May's Heirs*, 2 Bibb, 448; *Bennet* v. *Paine*, 5 Watts, 259, 261; *Sowle* v. *Holdridge*, 17 Ind. 236; *Shaw* v. *Whiteman*, Peake's N. P. C. 42; *Loyd* v. *Passingham*, Coop. C. C. 152; *Bainbrigge* v. *Moss*, 3 Jur. N. S. 58, 61, 62; *Parsons* v. *Hughes*, 9 Paige, 591; *Ham* v. *Hamilton*, 29 Ga. 40, 42; *Adams* v. *Sage*, 28 N. Y. 103; *Barlow* v. *Ocean Ins. Co.* 4 Met. 270, 274.

b. The complainants' testator *was not misled* by the alleged fraudulent misrepresentation. He was an active participator in the fraud complained of, by voluntarily and intentionally, though fully advised, making the transfer complained of. He or they cannot revoke it. *Clapham* v. *Shillito*, 7 Beav. 146, 149, 150; *Moore* v. *Adams*, 8 Ohio, 373; *Roman* v. *Mali*, 42 Md. 513, 534–537; *Creath's Adm'r* v. *Sims*, 5 How. U. S. 192, 204; Bigelow on Fraud, 337, 338.

c. The complainants seek in this suit to defeat and destroy the rights of an innocent third party, Virginia Boyd, whom they neither allege nor prove to have been in any way cognizant of the alleged fraudulent misrepresentations. Bispham's Principles of Equity, § 189; Kerr on Fraud and Mistake, 436; *White* v. *Graves*, 107 Mass. 325, 328.

Furthermore, the admissions of Jonathan, the only evidence upon which the complainants rely, are not competent evidence as against Virginia Boyd, his wife, whose title to her separate estate the complainants attack. 1 Greenleaf on Evidence, § 185; *Aldrich* v. *Earle*, 13 Gray, 578, 579, 580; *Holbrook* v. *Holbrook*, 113

Mass. 74, 76 ; *Murphree* v. *Singleton,* 37 Ala. 412 ; *McKay* v. *Treadwell,* 8 Tex. 176, 178–181 ; *Hanson* v. *Millet,* 55 Me. 184, 190 ; *Thomas* v. *Maddan,* 50 Pa. St. 261, 265 ; *Livesley* v. *Lasalette,* 28 Wisc. 38, 41 ; *Gillespie* v. *Walker,* 56 Barb. S. C. 185, 187, 188.

Nor are any statements of William Boyd competent evidence as against Virginia's title, even if, as the complainants seek to establish, the compromise attacked was a mode adopted by William of placing his property in Virginia's hands in fraud of his creditors.   1 Phillips on Evidence, p. 322 *m.* ; Bump on Fraudulent Conveyances, 548 ; *Aldrich* v. *Earle,* 13 Gray, 578 ; *Holbrook* v. *Holbrook,* 113 Mass. 74, 76 ; *Hurn* v. *Soper,* 6 Har. & J. 276, 281 ; *Hutchings* v. *Castle,* 48 Cal. 152, 156 ; *Garrahy* v. *Green,* 32 Tex. 202, 203 ; *Headen* v. *Womack,* 88 N. C. 468, 471 ; *Phœnix* v. *Ingraham,* 5 Johns. Rep. 412, 426 ; *Tabor* v. *Van Tassell,* 86 N. Y. 642, 643.

d. The complainants do not invoke the equity power of this court to resist the enforcement of a fraudulent compromise, but they ask the court to annul a compromise fully executed, and that, without offering to place the defendants *in statu quo* by restoring what said defendants surrendered, as the consideration of said transfer, and as a part of said compromise.   This is contrary to the established principles of equity.   Bigelow on Fraud, 408, 409 ; Kerr on Fraud and Mistake, 436 ; *Clough* v. *London & N. W. R. R. Co.* L. R. 7 Exch. 26, 37 ; *Bwlch-y-Plwm Lead Mining Co.* v. *Baynes,* L. R. 2 Exch. 324, 326 ; *Gould* v. *Cayuga County Nat. Bank,* 86 N. Y. 75, and cases cited ; *Graham* v. *Meyer,* 99 N. Y. 611, 615 ; *Neblett* v. *McFarland,* 92 U. S. 101, 103 ; *Stewart* v. *Hass,* 23 La. Ann. 783 ; *Allison* v. *Connor,* 36 Mich. 283 ; *Smith* v. *Brittenham,* 98 Ill. 188, 197 ; *Potter* v. *Titcomb,* 22 Me. 300, 305–307 ; *Bassett* v. *Brown,* 105 Mass. 551, 556–559, and cases cited.

Moreover, the complainants have no case upon the facts as disclosed by pleadings and testimony.

Follows in the respondents' argument a discussion of the evidence, which is here omitted.

*March 5, 1887.*   STINESS, J.   This bill, brought by the executors of Alfred Anthony, a judgment creditor of William and

Charles A. Boyd, and by the administrator of the estate of William Boyd, seeks to reach property standing in the name of Virginia J. Boyd, wife of Jonathan, as, in fact, the property of William Boyd. William, Charles, and Jonathan were brothers. William Boyd and Alfred Anthony, in renewal of previous notes, were indorsers upon a note of Charles for the sum of $17,000, given in March, 1879, which Anthony was obliged to pay in September, 1879. Charles gave a mortgage upon lots on Chalkstone Avenue, in Providence, to secure William and Anthony for their indorsement, and another to the Jackson Bank upon property on Laura Street to secure notes held by the bank, amounting to $23,250. In June, 1878, while these debts were outstanding, William was, and for some time had been, the owner of valuable property in Chicago, which he then transferred to Jonathan, who thereupon gave a mortgage on the same for $60,000 to one Bogle, a nephew, William holding the notes. The pretence was that this transfer was to secure debts due from William to Jonathan, amounting to more than $25,000. For some years before that William had received a salary of $10,000 a year, and Jonathan had received about $2,000 a year. In September, 1879, William, in the name of Jonathan, made a contract to sell the Chicago property to O. W. Clapp for the sum of $40,000. Suspecting that William could not owe Jonathan so large a sum, and that the transfer was made to keep the property from William's creditors, the Jackson Bank and Anthony brought suit against William for their respective claims, attaching the property as his. This obstructed the sale to Clapp; and finally, in October, 1880, all parties agreed that the sale might be consummated for about $45,000; of which sum $25,292.52 was to be paid to the Jackson Bank, a mortgage was to be given for $16,000, and the balance was for expenses, taxes, and cash already advanced. The attachments were released by the above payment to the Jackson Bank in full settlement of its claim, and $10,000 on account to Anthony, with a new note signed by Charles and indorsed by William for $8,059.25, the balance of the debt. It is alleged in the bill, and substantially so stated in the answer, that it was claimed and insisted by the Boyds that Jonathan was advancing the money to carry out this arrangement by waiving his right, as

owner, to claim the portion of the purchase-money paid to the Jackson Bank, and by advancing in cash the $10,000 paid to Anthony. In consideration of this waiver and payment it was further arranged that the mortgages on the property of Charles in Providence should be transferred to Jonathan, or foreclosed under his direction. This was done, and, under the sales, the title passed to Virginia. The complainants allege that after the death of William Boyd they learned that the Chicago property belonged to William and not to Jonathan, and also that the property in Providence was held for William's benefit, and was in fact his. This bill was then brought to declare the conveyances of the property in Providence fraudulent and void as against the complainants. The defendants contend in the first place that there was no misrepresentation about the ownership of the Chicago property; that it was held by Jonathan as security for William's indebtedness to him, and that the $10,000 paid to Anthony was advanced by his wife from the proceeds of a loan upon *property left* by her as collateral. We are constrained to believe, from the testimony, that the property in Chicago belonged to William, and to him alone. The conduct of Jonathan was not consistent with one taking security for so large an amount, especially when it constituted the bulk of his property, and he knew, as he says, that William had no more. He knew nothing of the market value of the property, only that it had cost a large sum several years before; he had no examination of its title or condition; he took no part in its management or income; and, above all, he gave a confessedly fictitious mortgage for $60,000 upon the very estate he claimed to be taking as security, the mortgage notes being held by William and returned to Jonathan after the sale. Genuine business, even between brothers, is not done like this. Neither are we satisfied that William was indebted to Jonathan in any such sum as he claims. We do not say it was impossible for Jonathan to have saved so large an amount from the income he received; but we hardly expect to find, in one character, the persistent and patient frugality, which accumulates so much, combined with the unusual and lavish liberality which lets the bulk of it run so many years without a single payment of interest and without security. Furthermore,

Jonathan's written statement to the assessors of taxes, whether under oath or not, was a solemn admission that he was not at that time worth enough to loan what he claimed to have loaned. True, he contradicts that statement now, and, if it stood by itself, we might think he is telling the truth now, and did not then. But in view of the other facts in the case we think we must give greater weight to his then statement than to his present assertions. Then, looking to the conduct of the parties after this transaction, we find it not in harmony with their present claims. A mortgage on the Chicago property, as a part of Clapp's purchase-money, was left in the hands of William, which he afterwards sold, paying $14,000 to Jonathan from the proceeds. Now the latter says that payment was upon a note for $10,000 given in 1866, upon which nothing had ever been paid and which had about doubled. Yet he says he surrendered that note upon payment of a little more than half of it, notwithstanding he had made a recent loan of $10,000 for which he had no note. It is much easier to believe that the payment was a return of the recent loan, with some other small sums which Jonathan says that William borrowed about that time. But, however this may be, from the time of the conveyances to Virginia Boyd until his death, William, who was supposed to be a single man, lived in one of the houses on Laura Street, not only paying no rent, but receiving all the rents of the other houses, amounting to $104 a month ; while Jonathan and Virginia, claiming to be the owners, were, with their family, living upon $15 to $20 a week. Moreover, when some of the lots on Chalkstone Avenue were sold, $800, all that was paid in cash, went to William. Thus, from the beginning to the end of these transactions, the conduct of the parties constantly points to William as the owner of the property. We think from the testimony that it was his. There is not a particle of evidence to show that Virginia's money went into this matter, except the dubious answers of Jonathan Boyd about the $10,000 : "I did ; or my wife paid it." "I raised it : my wife left the collateral," etc. He says he gave her his property in 1878, but nothing appears to prove it. No note from William, no testimony from any bank, no evidence of the collateral, traces the details of the facts. In this view Mrs. Boyd does not stand as an innocent pur-

chaser for value, but as a party to the scheme to cover William's property. She does not undertake, specifically, in the answer, and not at all in the testimony, to maintain her relation to the property as a purchaser for value. On the contrary, the transfer of the mortgage by Anthony ran to Jonathan, and the other was under his control. She acquired title from him without consideration, unless she proved that the original consideration moved from her; but this she does not do. The statements and admissions of Jonathan relating to the property are therefore admissible, and they abundantly confirm the conclusions which are quite apparent from the conduct of the parties. But, assuming the fraudulent representations as claimed in the bill, the defendants further contend that the arrangement was a compromise of this very fraud, which the complainants are not entitled now to disturb. We do not think this is so. To support a compromise there should be a doubtful *bonâ fide* claim, about which the parties stand on an equal footing as to knowledge or ignorance of facts, and in settling it there should be no imposition or deceit. That is no compromise where one party knows he has no claim, but deceives the other party into believing that he has one. 2 White & Tudor Lead. Cas. Eq., Hare's Notes, 4th Am. ed. pp. 1708 *et sq.* and cases cited. It is the mutual concession, or the common risk in the event, which supports a compromise. If one has no claim, and he knows it, he is not conceding in a compromise: he is cheating. He has nothing to concede; and his only chance in the doubtful issue is that possibly his fraud may prevail. *Headley* v. *Hackley*, 50 Mich. 43. In this case the Boyds knew the actual facts; the creditors only suspected there was fraud. That suspicion, however, was disarmed by renewed statements, of which the creditors had no means of knowing the falsity, and upon the faith of which they treated. They did not thereby condone a fraud; the fraud was perpetrated then and there. The cases relied on by the defendant are those where a doubtful claim has been settled without deception and upon an equal knowledge of facts. In such cases the settlement will stand, even though it may turn out that the claim of one party could not have prevailed. In applying this rule the defendants assume that the creditors knew of the fraud, because the bill states that they, " knowing that said

Jonathan Boyd, from his position in life, could never have been in possession of so large a sum, suspected that such mortgage, if any there was, was a fraudulent device," etc. The mortgage here referred to is one for $60,000 on the Chicago property, which William at first represented he had given to Jonathan. This does not show that they knew or could have ascertained the essential facts. They suspected fraud and attached the property. Mere suspicion, without knowledge of facts, will not estop a party from setting up fraud in a compromise. *Baker* v. *Spencer*, 47 N. Y. 562. The evidence shows that they did not know the real facts until after William's death. It was insisted, at the time of the settlement, that Jonathan was advancing money to the full value of the security he received. The agreement was made in belief that this was true. The creditor now finds that it was not true, and that the property held by Virginia was all along the property of William, and held for him by her. Here was the deception. But the creditor has never compromised this; nor, if he had, would he be estopped from setting up that he had been deceived in doing so.

If the property belonged to William, and was only held for him by Virginia, the defendant's point, that the parties must be put *in statu quo*, does not arise.

We think the complainants make a case for relief.

After the foregoing opinion, the respondents filed their petition for a hearing.

*July* 30, 1887. STINESS, J. We think the first and second assignments of error, upon which the petition for a hearing is based, are not well taken. The answer does not set out that Virginia J. Boyd bought the land sought to be reached by this bill as an innocent purchaser for value, but avers that her husband, Jonathan Boyd, was to make the advance of ten thousand dollars stipulated to be paid to Alfred Anthony in the agreement made about the Chicago land; and that the mortgage held by said Anthony was to be transferred to Jonathan, and the mortgage held by the Jackson Bank foreclosed under his direction. The testimony, put in the most favorable light for the defendants, supports the averment of the answer, and shows that if Virginia's money went

into the transaction it went in as a loan to her husband.  It does not show that she received the conveyance of the land in payment of that loan, but inferentially the loan was paid in cash, and the parties treated the land as William's and not hers.  If Jonathan's money was advanced it was repaid to him; if it was Virginia's money it was repaid to her husband, who acted as her agent in the matter, the same person from whom it had been received.  It was not money put out for the purchase of this land, for it was not part of the arrangement that it should go to her.  The court is of opinion that the finding that she was not an innocent purchaser for value was correct.

The third ground for the petition assumes that the court held, in its opinion in this case, that renewed statements of a fraud constitute a new fraud, which will avoid a compromise of that same fraud.  Such is not the fact.  The opinion distinctly stated that the fraud which entitles the complainant to relief was perpetrated at the time of the agreement.  It arose in this way.  The Chicago property had been transferred by William to Jonathan Boyd, on account of a pretended indebtedness.  Two creditors did not believe this was an honest transfer, and attached the property as William's.  Then came the negotiations which led to the agreement, in which the Boyds insisted upon and renewed previous statements about the large debt due from William to Jonathan, and also stated that Jonathan was to increase that debt by a further advance of $10,000, for all of which his only security was to be the mortgages on the land in Providence and Chicago.  The idea that was carried was that William had nothing, and that Jonathan was doing all this.  It now appears that the Chicago property and its proceeds belonged to William, and that Jonathan did nothing more than to loan his brother $10,000 for a short time, which sum was repaid in February, 1881; and that William held, and in part disposed of, the property in Providence as his own.  The misrepresentation upon which the court thinks relief should be granted relates to the property in Providence, which is the subject of this bill, not that in Chicago.  The defendants seem to mistake in this respect not only the opinion of the court, but the purpose of the bill.  The bill does not seek to set aside the transaction about the Chicago property, but only that about

the mortgages upon statements then and there made.  Anthony, for instance, gave up his mortgage, believing the property it covered was to go to Jonathan in payment of the debt which his brother owed him and the money he was advancing.  It appears there was no such debt as was claimed, and that the temporary loan was repaid out of the proceeds of the very property which was claimed to belong to Jonathan, and that the Providence property was held as William's and not as Jonathan's property.  The statement about the debt was one element of the misrepresentations, but there were other misstatements sufficient to open the transaction on the ground of fraud, even assuming it to be a compromise.  The court treated the arrangement as a compromise, because it was so put by the defendants, and it was not necessary to decide whether it was so or not, for even as a compromise it could not stand.  It was, in fact, the releasing of an attachment and security for a consideration, and upon certain statements with reference to the indebtedness, the proceeds of the pending sale, the advance of a further sum, and the future ownership of the property in Providence.  Whether this amounts to a compromise, the creditor retaining the entire balance of his debt, it is not necessary to say.  Whatever it may be termed, when it appears that the release of the mortgage security was brought about by false statements about the indebtedness to Jonathan, theretofore made and then repeated ; by further deceptive statements as to a payment by Jonathan, which was but a pretended or nominal payment by him, or a temporary advance soon returned from the proceeds of the mortgage, which was represented as going to Jonathan for the relinquishment of his claim on the property attached ; and by the statement that Jonathan was on this account also to have the Providence property for such debt and payment, when in fact William was to have it, and did have it, except in name, all along, — the court thinks such a transaction should be opened.

As to the fourth ground.  The complainants' representative in this transaction testifies that he was misled, and the court thinks this is true.  Even though he and his testator doubted whether William could owe Jonathan what they said he did, had he known that William was to have the $14,000 mortgage on the Chicago property, out of which he was to pay Jonathan for the loan of

$10,000, and then to have the Providence property besides, it is difficult to believe that he would have released his attachment, or, at any rate, have given up his mortgage security without full payment.

The fifth ground of the petition is covered by what has been said above. The original fraud was the conveyance of the Chicago property by William to Jonathan. That has been settled. But in doing so the complainants' testator was induced, not only by old statements repeated, but by new misrepresentations, to part with valuable security for his debt. This fraud has never been compromised. Although it grows out of the former transaction, it is distinct and independent. To hold what the defendants claim, the court would have to say to the complainants: " Notwithstanding in settling a fraud you were induced to part with security by deceit and imposition, you are now estopped from setting up this new fraud in order to regain what was wrongfully obtained from you."

As to the sixth point. Undoubtedly " it is a general rule that a party who seeks to rescind a contract into which he has been induced to enter by fraud must restore to the other party whatever he has obtained by virtue of the contract." The rule, however, has no application to this case. Whatever was paid in this matter was, in reality, paid by William. As the respondents have paid nothing on account of this transaction which they have not already received back, there is now nothing to restore to them. They held the property as William's, and for his benefit, and they have no claim upon it as against his creditors.

The petition for rehearing upon all the grounds alleged must be denied. *Order and decree accordingly.*